2024, 1258, and 59. Ms. Pei, when you are ready. May it please the Court. The trial court usurped Commerce's authority in multiple respects. First, not only did it force Commerce to place untimely submitted documents on the record and condone arguments and allegations that were untimely raised, it then forced Commerce to construe those documents as complete and accurate, depriving Commerce of its right to probe their reliability. I think the SR Court put it best when it said that the trial court's order usurps agency power, undermines Commerce's ability to administer the statute entrusted to it, contradicts important principles of finality, and discourages compliance. Ms. Pei, a question, procedural question for you. As you know, we look through CIT decisions, although we give them great respect, and review the agency. Are we reviewing the agency here as it finally came out, or as we knew that it wanted to come out? Because it was coerced, right? Sir, I think there's like a few different ways you can look at it. First, we do maintain that Commerce's original determination was lawful and supported by substantial evidence, but it is true that Commerce undertook its first remand not under protest, where it further explained its decision and supported that with explanations and substantial evidence. So I'm not sure if I'm understanding your question correctly, but I think that, you can either review Commerce's original decision, or at the very least, we would say that the court's second remand opinion is the one that should be reversed, because that's the one where it ordered Commerce to reopen the record and put documents on it, and not only that, committed the even more egregious error of deeming them complete and accurate, and depriving Commerce of the ability, which is inherent within agency power, to probe the reliability of those documents and assess them for accuracy and all of that. And so I think, again, there's a couple different ways that you could look at it. In Good Luck India, we talked about Commerce having the authority to balance finality versus completeness at the time of verification. Do you see those factors playing into Commerce's response to the first remand decision? Or is there additional factors, like, for example, deterrence in any way? Yes, I think deterrence is certainly a factor, and when you take Good Luck India and SR in conjunction, I think it's really important, SR's statement about discouraging compliance, when you do what the trial court did and allow Chengin to submit those documents so late, and that's even aside from the whole deeming it complete and accurate, you discourage parties from being forthcoming and building a complete record in the pre-preliminary stage of the proceeding, which is where it should be doing this type of thing. And again, I think this court has acknowledged that verification is a point of no return for Commerce and the parties, and Commerce's discretion is at its broadest during verification as to what it can accept and what it doesn't have to accept. And here, Commerce saw the conversion formula, decided it wanted to accept that, and then declined to accept the additional pages. And again, I think it's important to note here that this is compounded by the error of deeming the documents complete and accurate, because Commerce stated multiple times in its first and second remand redeterminations that the reason it ended up finding how it did on its second remand is because the court's decision did not allow it any room to find otherwise. Do we actually have to decide this document's issue, or that is, do we know from one of the remands, there's a lot of remands here, so it's hard for me to keep track, but do we know that Commerce, even if they were required to treat the full document as complete and accurate and a national standard, that they still would have, if not compelled otherwise, have come to the conclusion that Chengen's rate should be that higher rate? I think that this is where the distinction between the court improperly ordering Commerce to put the documents on the record and then also ordering Commerce to deem it complete and accurate comes into play. Commerce stated in its, I think, second remand decision that it's not clear how this new information, even assuming it's the Chinese national standard, significantly alters the record of the investigation. However, because the CIT held that the Chinese national standard is complete and accurate, that Commerce felt that it must treat the log volumes calculated by Chengen as accurate and couldn't question, for example, the age of the standard or the absence of any record evidence indicating whether it's still in use or been revised or anything like that. So I think that the court, you can almost treat them as two separate issues, but certainly combined they constitute reversible errors. So we think that the court shouldn't have ordered Commerce to put the documents on the record in the first place, and even if it did, it certainly erred in deeming them complete and accurate, particularly without any explanation as to why it deemed them complete and accurate. That's helpful, but do you argue, I think I got this from your brief, that in the alternative, if we affirm what the CIT did with respect to the document, that we nonetheless could and from your view still should reverse the finding that Commerce erred by using the intermediate production measurement method? Yes, we certainly think that's the case. Even if the court properly ordered Commerce to reopen the record and place the documents on, it certainly committed reversible error in deeming them complete and accurate, and then it also committed reversible error in finding that Commerce was not allowed to seek corroboration of the log consumption volumes, particularly in light of the inherently imprecise way of calculating log volumes, and particularly in light of the fact that Commerce, until verification, thought that Linyi Cheng'en was representing that it had invoices from suppliers and only found out at verification that it didn't, and not only that, Cheng'en has acknowledged that it actually does have corroboration from its suppliers in the form of delivery sheets, and yet it failed to put that information on the record during the fact-gathering stage of the proceeding, and I think that's something we've touched on in our briefs, but I think it needs to be emphasized more, which is that all of this could have been avoided had Cheng'en put the delivery sheets on the record in a timely fashion and put the conversion table and formula on the record in a timely fashion. It did neither of those things, and Commerce only found out at verification, which led to where we are today. I have another question, going back to the policies and deterrents versus ideas of finality and all this different stuff. What do you think, I read the Court of International Trade's opinion as saying that, you know what, if you're going to consider two pages, you should consider all 12 pages of this document, right? But what is the, what do you think is the policy behind giving Commerce the discretion to say, no, we're only going to consider these two? Well, I think that, again, Commerce at verification has a very, very broad amount of discretion, and Commerce also is the one who can decide what documents to request and accept at verification, and I think here, Commerce reasonably drew a line between the two pages that it found of its own accord and the extra pages that Lin Yu Cheng'en pressed upon it later. And I think Commerce reasonably determined that the two pages it found were information that fell within the verification's new information exception, and the extra pages, which it found,  But again, we think that even if the Court didn't err in ordering Commerce to accept the documents, it certainly erred in multiple other respects. I see I'm into my rebuttal time. I just quickly wanted to touch on the separate rate issue, though I didn't want to let that go unsaid. I think here, it's very clear that the Court substituted its judgment for Commerce's and weighed the evidence while purporting not to. You know, despite what the Court said about only having two data points or something along those lines, we laid out in our briefs that Commerce actually addressed several pieces of evidence, both from the separate rate exporter in the petition and the 40 separate rate plaintiffs, and the standard here is whether the amount of evidence Commerce relied on rises to the level of that a reasonable mind could have concluded as Commerce did, and I think in this case, it's very clear that a reasonable mind could have found as Commerce did, and we also think that the Court placed undue reliance on BESPAC and adopted that wholesale without consideration of why this case is very different than BESPAC. I'll save the rest of my time. I have one question for you, quickly, which is, it's my understanding that that issue you just mentioned would not be something that this Court would consider if we were to say that Commerce erred in its intermediate input methodology analysis. Yes, that's accurate. I mean, not Commerce. I mean, CIT. That's accurate. This issue only comes into play if the Court finds that the CIT did not commit reversible error regarding the intermediate input methodology. Thank you. Thank you. We'll give you two minutes for rebuttal. Ms. Thorsen. Thank you, Your Honor. Good morning to the panel. I think Ms. Bay handled the issue of the document and the lower court's treatment of that very well, so I'm going to focus on the separate rate issue. Congress made itself clear where the mandatory respondents are zero or their margins are based on adverse inferences. Those margins are to be weight averaged together to produce the separate rate. Here, Commerce employed the congressionally expected method with a slight deviation. It used a simple average. Nobody complained about that. So that's how they came up with the margin, rather than a weighted average. But the lower court, rather than either affirm that or require a weighted average, it endorsed a sharp and inappropriate deviation from the expected method in which there's no averaging at all. And one of the mandatory respondents is considered fully representative of all the separate rate companies. Is the key case you're relying on here Boson? Is that right? PrimeSource, I think, also is very relevant here. Boson, I think, gives you a closer analog with the facts because it involves a non-market economy case. But PrimeSource also is a case in which separate rate companies came in and said the expected method, we don't like it. And this court said, no, this is what Congress expects. And you actually, you, respondents, whoever wants to deviate from the expected method is the one that bears the burden of showing that it's unreasonable to follow that expected method. It was a market economy case in PrimeSource involving Taiwan, but I think the PrimeSource case gives a lot of support for a line of precedent that this court has been drawing in the wake of BestPak, which narrows BestPak significantly and makes it very clear that the expected method really is to be used. And only if there is substantial evidence that someone can come up with that shows that it is unreasonable to use that expected method can that expected method be done away with. And in that regard, I'd like to point out, yes, there is a bit of a deviation that Commerce had here with the expected method. They used a simple average instead of a weighted average. At the time this case happened, that was pretty common. This court's precedent and precedent of the CIT subsequently involved respondents and others who came forward and said, hey, wait, the statute actually says weighted average, not simple average. At the time of this case, those cases hadn't really started to percolate through the courts and simple averages were being accepted by pretty much all parties. Again, no one in this case actually worried about the fact that a simple average was used versus a weighted average. Now, if you look at pages 1384 to 1386 of the appendix and our opening brief at 30 note six, you'll get an idea of, okay, how far a field from a simple average with the weighted average actually take us here. But my point is this deviation that no one complained about, if the court were to say Commerce go back to a weighted average, my client would be perfectly happy with that. The deviation that the separate rate respondents want and that the court below affirmed is so much greater than what Commerce did. And the corollary to that is that the evidentiary burden to justify that sharp deviation must necessarily be high. Here the separate rate respondents simply have not come forward with information that justifies that kind of sharp deviation. And just to briefly touch on the one issue where we're not totally aligned with the government, its final remand determination that was accepted by the CIT, Commerce excluded two voluntary respondent companies that had filed questionnaire responses. They were not actually accepted as voluntary respondents, but Commerce excluded it from the order on the basis of this court's decision in Changzhou Hod and just stating this was reasonable. In doing so, however, they didn't take into account the fact that the Changzhou Hod court actually didn't require exclusion of voluntary respondents and the agency didn't explain why it was treating this case distinctly from its post-Changzhou investigation into Vietnamese tires in which the agency declined to exclude questionnaire filing voluntary respondents. Thank you, Your Honors. Thank you. Your time has expired. Mr. Menegas. May it please the court, such a long, complicated case. I was thinking of dividing my time into the three issues, the national standard issue and then the invoicing issue, which are actually linked, and then talking about the separate rates last since we didn't divide our time, I'm speaking for all the appellees here. So, on the issue of the government standard, it really doesn't make sense, and the court pointed that out. It's like if you add a title to the novel, like Gone with the Wind, and you tear that off and it's translated, and then you take the introduction, like what is the point of doing that? I have an explanation for it, but it's not the one the government offers, and they try to impugn Cheng Zhen's responses as a way of setting up an argument that we should have provided this all along, but actually their arguments are without merit. The questionnaires that they cite don't say that you're supposed to give that document. They say give your documents created in the course of production. They say nothing about conversions submitted, and I can give you the appendix site for that if you want, if that would be helpful to the court. It's in here somewhere. Anyway, so their citations just don't give any kind of basis to support an argument that we should have given the information earlier. Let's see, this is appendix 2797, course of production, and this conversion happened before production when they were intaking the raw material, and that is our section D from February 28th, the cost section, and then in the supplemental section, they ask us to describe the types of records we keep, and we explain that, warehouse in tickets, and they later asked us for warehouse out tickets, and we provided them out of inventory, and they also asked us for material purchases for auxiliary materials such as glue, which we provided them. But you do, I think the record is clear now, you do use this conversion chart as part of your calculation of your cost of production. It's part of the intake of the logs, right? So, I'm just... It's part of the process of figuring out what your costs are. It's not a production record, so these, they never, let me just summarize. We filed nine supplemental questionnaires. Four of them were on section D. They never asked us for this conversion. Let's even just assume, I'm willing to assume for the sake of the question, let me, I have another question, let me ask it. I'll assume that this document was not responsive to any of their requests. Is there nonetheless, isn't there still something meaningful to the fact that we're talking about the verification stage? Okay, I'd like to talk about that. Okay, but let me ask the question. Please let the court ask questions. Okay. The fact that it's at the verification stage, doesn't that mean there need to be real restrictions on any new evidence coming in at that stage? And that gives Commerce necessarily a lot of discretion in deciding what additional information it's going to consider. Isn't that implicated here? Okay, their cover letter, which they quoted in their brief, says we will accept new information except in these limited circumstances. And the judge found that we met the limited circumstance, and she cited that Mid-Continental Steel case, information that corroborates information that's already on the record. So we're reviewing Commerce's decision de novo. Right. So actually, in reality, Commerce takes thousands of pages of new information at verification. So there's a cover letter, and then there's a reality. And the verifier has plenary authority to track down any lead he finds in any direction he wants to go. And this is one of those things. They never understand everything about a company until they do the verification. They learn about the company at the verification. He learned there was a national standard that was used to double check the delivery sheet. Can I ask you something? You said earlier that the national standard, that there was no document that specifically asked you to provide it. That's right. Let me talk. I'm not done yet. My question is, how were they to know to ask you for that? Well, it wasn't a production record. So they didn't need to ask us for it. No. How were they to know to ask you for it? You said that they didn't ask you for it. Therefore, you didn't know that you had to provide it. I'm asking, how were they to know that they were to ask you for it? Well, we cited a case of multilayered wood flooring from 2009, where they did ask that question, where we had a manager who responded consuming logs. We didn't prompt them. In the facts of your case, what would have caused Commerce to think that they needed to ask you how you, I mean, they were asking you for your inputs for all your calculations, and you gave them the calculations, but you did not tell them that this is how you were calculating the log value, right? What the company did is they took the cubic meters of log on the delivery sheet, and they tested it against, spot checked it against the national standard to see that it was correct. They had the diameter of the top of the log and the length of the log, and they could say, yes, the farmer has 15 logs, and he says this one's 30 cubic meters, so let's double check that against the standard, and then we'll record 30 cubic meters. Is this a different case you're talking about right now? No, I'm talking, the reason Commerce would know there's a conversion is because logs, there has to be a calculation to convert the log into cubic meters. All Asian companies record logs in cubic meters, and it's all converted in every case. So they should have known this from all the years of expertise doing multilayered flooring, doing plywood one. This is plywood two, this case. But regardless, like everything I just said, you could argue is moot because guess what? The verifier asked for the standard. He went into the workshop where they had the table for the conversions, and he said, what's that? And we said, it's the national standard. Then he asked to open the drawer, and in the drawer was the full 12-page standard rolled up, and he said, I want to see that. Bring it to the verification room. So that's what we did. Part of the facts that's disputed, right? There's a dispute about exactly how that process works. I don't think it's disputed that he noticed the company official with the index and asked to open the drawer. And see what happened, this does get very complicated, but in remand one, they submitted a declaration from the verifier. It is the identity, but it's really kind of silly because there's only three verifiers on the team. And they say that they asked for the tables. I mean, there's a lot of problems with that, and we had our counsel and two company officials issue rebuttal declarations, and they took that all on the record and asked for the full standard fully translated in that first remand. But my point is really that the commerce has plenary authority to cull the exhibits. They're collecting thousands of pages. If he looks at a standard and understands it and says, I don't need pages four through 12, and I don't need the cover page, it's not an issue. There was no issue in the report. It was an A plus perfect report. There was no issue flagging us to file a case brief on this. He never said in the report, I'm rejecting anything. And he took the meat, the operative tables, pages two and three. The only thing he didn't take was a cover sheet with one line on it saying it's the national standard. And the standard code, which enables you to find it on the internet, is printed on page two. In addition to the CIT ordering commerce to take the full document and put all the full document on the record, the CIT also ordered commerce to treat that document as complete and accurate. Even if we grant you the first point, isn't that second point going beyond what the court should properly do? Well, we also argue they should take judicial notice because it's locatable in 10 seconds on the internet as a national standard. Is that what gives rise to the authority of the trial court to order commerce to treat it as complete and accurate, that it can be that judicial notice? Is that what does it? Well, I think the document speaks for itself, and it's independently verifiable on the internet. So, in all the four remands, the petitioners never came up with a way to undermine that standard. And actually, in all the later reviews, we're in review seven now, they've never undermined that standard. And they had multiple opportunities to try to do it. And the only cited court case is going back to the 1800s, but in our brief to 1919, where the US uses similar standards. And we also gave them other information that he declined to take about the EU standards and other national standards at verification. So, we figured as long as he took the standard we're using, we're not going to make an issue out of the other stuff. And there's just nothing in the report about rejecting the cover page. We didn't know why he rejected it. And it didn't seem to matter from this A plus report. All right. Then you also had a private... Hold on, hold on. The further argument that I'm interested in your response to that is, even if the full document should be on the record, and even if we all agree it's complete and accurate, why is it nonetheless improper for commerce to say we're concerned enough about it that we want to use veneers, the intermediate product input, rather than the trees themselves and this whole national standard? Well, it's a huge penalty on the company. And they've only used the intermediate methodology, like in garlic, where they didn't know how much rain fell on the crops. This is an industrial product, and the company had books and records supporting it. But isn't it within commerce's discretion to say, we are troubled, in my words, of course, troubled by concerns, even if we accept it's a national standard and it's accurate, we still think the better way in this instance to measure the production costs is to go to an intermediate? No, it's unsupported by substantial evidence and massively punitive on the company. It raised their rate like 250%. And the company is normally treated on the way the raw materials that are actually consumed. And the documents that are used in every case are the warehousing ticket compared to the raw material purchase, which is the other issue I should turn to. And that's why they link those two issues in their attack on the company. But getting back to before, I just wanted to note, and it's in the verification report, they have a private translator. They can ask us. We have four lawyers that are fluent in English and Chinese. They never asked us. Once they take those pages, they're deemed adequately translated. But if they had a question about it, they could have issued a letter or a deficiency questionnaire. And I would argue the law, 1677md requires them to do that. And they didn't do any of that. They kind of sat on it and then blew us up in the final. But so the other document that is used, so there's two documents that are used to verify raw material purchases, the commercial invoice for the purchase and the warehouse in ticket. And you compare them. And in this case, it's the same species and the same cubic meters. And so what they're saying is, well, wait a minute, you issued the raw material invoice to the customer, the guy that was selling you the log. And we're like, yes, because it doesn't say this in the verification report, but you have to have a certain corporate status to have your own VAT forms where the seller issues it for poor farmers. They don't have that status and they're not allowed to issue it. But the company had an office with the government forms and the government chops on it as a government tax form. And even in the section D of the questionnaire, which is also in the appendix, it says you can provide audit of financial statements or tax returns to verify your submissions because they recognize if you prepare a tax form, it's presumed to be correct. And they took many of them at verification, but they never asked for them in a supplemental questionnaire, which was kind of shocking. They never asked for a single warehouse in ticket or a single commercial invoice for logs. They asked for glue. They asked for other minor materials, but never for the logs. It's their right. They propound the questions. But then they thoroughly investigated it at verification. And those VAT invoices verified all the way up to the cost and sales reconciliations that we are obligated to provide. And they all passed as is obvious from the report. So they can't just say the main documents ever used by a company aren't enough. They didn't cite a single case where somebody failed because they didn't keep a copy of a delivery sheet, like a FedEx receipt that something was delivered. So they can't fail over that. And they haven't suggested we fail over that. But what they did is increase the margin 250%. So we don't think it's supported by substantial evidence. And there was a similar case that may have been decided after a briefing on Shelter Forest, which was another plywood case on circumvention after the order came out. And it was a very odd version of circumvention where you have to prove the product existed before the case was filed in 2016. And there was a word for a glue, EV glue, that Commerce pretended not to know what it was. And Judge Rustani had the case. And the company wanted to put it in. Commerce rejected it. And then the company went to court and wanted to put it into the court, just like I wanted to put this cover page with one line on it onto the court. And she said, how can I decide whether I should take it or not unless I look at it? So she said, I'm taking the document to look at it. Then she remanded and said, you have to let this company explain what EV means in those materials. Can I interrupt you for a minute and just ask you, what do you think the standard of review here is that should be applied to whether the CIT exerted its authority or really whether Commerce had the discretion to only take so many of the pages at verification? What is the standard of review that we apply and that a court of international trade should  She applied arbitrary and capricious standard that they took a document that was legitimately part of the cooperation of documents already on the record, the warehousing tickets and the commercial invoices. It was arbitrary and capricious not to consider the entire document as opposed to just two  I don't care about pages 4 through 12 because they had logged diameters. Answer my question so I understand your answer. Did the court of international trade find that it was arbitrary and capricious to only take two pages versus all of the pages? Yes, but also found it particularly odd they didn't take the cover page and we don't care about the rest. So she found that it was bizarre. Like they either knew exactly what they were looking at and didn't need the cover page or they should have taken the cover page. Because the cover page would answer everything for them. Well, it shouldn't need to because the code for the standard was right on the page too. So you can find it on the internet in two minutes that way. Actually 30 seconds. So I'm running out of time. I guess I really wanted to talk about the separate rates. You ran out of time. Different group. Anyway, I guess if I can't talk about the separate rates, I'll rely on our briefs for that. I'm afraid your time has been consumed. Okay. Okay, thank you, your honors. Ms. Bay has two minutes. Thank you, your honor. I want to start quickly by saying that even to the extent that Commerce's initial questionnaire on APPX 1445 didn't, could be reasonably construed as not asking for the types of document that Chang'an is complaining about here, which we vigorously dispute. It's indisputable that the coalition, the petitioner, put the reliability of Chang'an's log volume calculations squarely at issue early in the proceeding. And it was Chang'an's responsibility at that point to build a complete record that would support their position that the log volume calculations were accurate. And that would include any conversion tables and formulas, any third party corroboration, anything of that sort. I'll quickly cite something that my counsel over here said, which is that the verifier has plenary authority at verification. I think that says it all. The verifier does have plenary authority and he exercised that authority. Quickly, regarding judicial notice, Chang'an wants the court to take judicial notice, but it's important to note that the CIT didn't actually take judicial notice. Indeed, it never explained why Commerce had to deem the documents complete and accurate. Quickly, I want to emphasize that this is not a punitive measure that Commerce took. It's not AFA or anything resembling AFA. Rather, it just informed whether Commerce found the log volume calculations reliable enough to use the FOP methodology or the intermediate input methodology. And here, yes, the intermediate input methodology ended up with a higher rate, but that does not mean in and of itself that the rate is less accurate or that it would even always be higher than valuing the factors of production themselves. I'm happy to answer any other questions that the court has. Otherwise, we ask that the court reverse. Thank you. Thank you, counsel. Thank you to all counsel. The case is submitted.